

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-4-2004

# Affinito v. Hendricks

Precedential or Non-Precedential: Precedential

Docket No. 01-2066

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Affinito v. Hendricks" (2004). *2004 Decisions.* Paper 670.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/670

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2066

THOMAS AFFINITO,

Appellant

v.

ROY HENDRICKS; ATTORNEY
GENERAL OF THE STATE
OF NEW JERSEY

On Appeal from the
United States District Court
for the District of New Jersey
D.C. Civil Action No. 99-cv-02560
(Honorable Joseph A. Greenaway, Jr.)

Argued July 28, 2003

Before: SCIRICA, Chief Judge,
RENDELL and AMBRO, Circuit Judges

(Opinion filed:  May 4, 2004)

Jean D. Barrett, Esquire (Argued)
Ruhnke & Barrett
47 Park Street
Montclair, NJ  07042
       *Attorney for Appellant*

Peter C. Harvey
     Attorney General of New Jersey
Nancy A. Hulett (Argued)
     Deputy Attorney General
P.O. Box 086
Office of Attorney General of New
Jersey
Department of Law & Public Safety
Division of Criminal Justice
Appellate Bureau
Richard J. Hughes Justice Complex
Trenton, NJ   08625
       *Attorneys for Appellee*

OPINION OF THE COURT

AMBRO, Circuit Judge

Thomas Affinito was convicted in 1998 of murder and kidnapping in New Jersey state court. After exhausting his state court remedies, Affinito petitioned for a writ of *habeas corpus* in the United States District Court for the District of New Jersey. The District Court denied Affinito's petition, but granted a certificate of appealability as to whether Affinito received ineffective assistance of counsel at his trial. While we conclude that Affinito's counsel failed to provide effective assistance, that failure was not sufficiently prejudicial to warrant granting a writ of *habeas corpus.*

**I. Factual and Procedural Background**

On February 22, 1985, Affinito, John Cupsie, and Michael Perez were drinking at a bar called Stash's Tavern in

Carteret, New Jersey. What follows was related primarily by Perez, who was an eyewitness to what occurred throughout that evening and the early morning hours of February 23.

The three men were regular patrons at Stash's Tavern and had met one another there. It appears, though, that they neither were good friends nor had they known each other very long. On the evening in question, they had been at Stash's for several hours and eventually began talking over a game of pool. They decided to drive to another bar in Carteret called the City Line. Cupsie drove. The three men arrived just before last call and ordered drinks. Almost immediately, Affinito and Cupsie began arguing for some unknown reason, but the two seemingly reconciled their differences within a few minutes.

Shortly thereafter, Affinito and Perez left Cupsie at the bar and walked outside. Neither Affinito nor Perez wanted to go home, and the suggestion was made that they could drive around in Cupsie's car. The two checked the car doors, but they were locked. Affinito then stated he could give Cupsie a "sleeper hold" (a wrestling term), render him unconscious, and take his keys. Perez expressed uncertainty in the plan, but Affinito insisted he could knock Cupsie out and do so without hurting him. Perez acceded.

The two men soon rejoined Cupsie inside, and he informed them of his desire to go home. All three returned to Cupsie's car, and he drove to Affinito's house.

Affinito was sitting in the back seat, as he had on the car ride from Stash's to City Line. While parked outside his residence, Affinito pulled out a pipe and asked Cupsie if he wanted to smoke marijuana. Cupsie responded in the affirmative. Affinito, however, did not have any marijuana. He pretended to put marijuana in the pipe and told Cupsie to pass the pipe to Perez. At this point, Affinito grabbed Cupsie from behind and pulled him into the back seat of the car. Cupsie began struggling frantically, and the fight spilled out of the car. During the course of the fight, Affinito pinned Cupsie to the ground and repeatedly punched his face and head until he was bloodied and unconscious. Affinito then said he had to kill Cupsie and strangled him with a shirt until he began foaming at the mouth. With Perez's help, Affinito put Cupsie in the trunk of the car and drove to a nearby junkyard.[1]

By the time Affinito arrived at the junkyard, however, Cupsie had regained consciousness. When Affinito opened the trunk, Cupsie punched him in the face in an attempt to fight his way out of the trunk. He was unsuccessful. Affinito again strangled Cupsie, this time killing

---

[1] Perez testified that he told Affinito to stop several times, thought about running away, and did not wish to assist in putting Cupsie's body in the trunk. But it appears Perez was either frozen by fear, in partial shock, or both. After Affinito cursed at him, Perez agreed to help.

him. After throwing Cupsie's body on the ground, Affinito drove the car from the junkyard. He and Perez wiped the car of fingerprints and abandoned it. Affinito also threw the shirts used to strangle Cupsie and clean the car into a sewer catch basin. He returned to his home around 4:30 a.m. on February 23.

After finding Cupsie's body in the junkyard later that day and conducting a preliminary investigation, the police took Affinito into custody. At police headquarters, Affinito gave two statements. In the first, he admitted leaving the bars with Cupsie, but he claimed that Cupsie dropped him off at home around 4:00 a.m. In his second statement, Affinito admitted that he killed Cupsie. Affinito alleged, however, that he attacked Cupsie only after Cupsie made homosexual advances toward him.[2]

Larry Bronson, the counsel retained by Affinito's family, hired Stanley L. Portnow, M.D., to perform a psychiatric evaluation of Affinito. Portnow's evaluation of Affinito's mental status at the time of the incident was based on two interviews with him, numerous sets of medical and psychiatric records, and police statements given by Affinito and witnesses. Portnow concluded that Affinito suffered from a major psychiatric disorder that "substantially impaired his ability to know or appreciate the nature

and quality of his acts or to know that they were wrong."

In 1987, John P. Russell was substituted as Affinito's defense counsel.[3] Russell hired a different psychiatrist, James Ferretti, M.D.[4] Ferretti based his

---

[2] As will become relevant later, Affinito claims to suffer from auditory, but not visual, hallucinations.

[3] At Affinito's Post Conviction Relief Act ("PCRA") hearing, Bronson testified that he "felt uncomfortable trying a death penalty case" and that his turning the case over to Russell had nothing to do with the fact his fee had not been paid in full. Bronson highly recommended that Affinito accept Russell as his new counsel. At the PCRA hearing, Bronson stated his belief that Russell was more than capable because he had seen Russell "spellbind juries with his skills."

To bolster his argument about Russell's ineffectiveness, Affinito points out that, prior to the 1988 trial, Russell had committed several ethical violations. Further, Russell was disbarred in 1990 for a misappropriating funds from his trust account in 1982. *See Matter of Russell*, 579 A.2d 1228 (N.J. 1990). Russell also had been sanctioned twice prior to Affinito's trial for tampering with a witness and failing to perfect an appeal. *See Matter of Russell*, 282 A.2d 42 (N.J. 1971); *Matter of Russell*, 541 A.2d 665 (N.J. 1988).

[4] There is no evidence why Russell retained Ferretti, but it is alleged Portnow refused to testify until the bill for his evaluation of Affinito was paid. Apparently neither Russell nor Bronson

3

evaluation on a single, fifty-five minute interview with Affinito. During this interview, Ferretti relied on Affinito to provide the facts of the crime. To underscore his reliance, Ferretti provided a disclaimer in his report that the "opinions and diagnosis recommendations and commentary contained in this report are based on the assumption that the patient has been reasonably accurate and truthful in his narration. If this was not the case, my opinions and diagnosis conceivably could be altered." While Ferretti later reviewed Affinito's medical and psychiatric records, Russell never provided Ferretti with Affinito's post-arrest statements to the police.

Affinito was ultimately charged with: (1) purposeful or knowing murder, N.J. Stat. Ann. § 2C:11-3(a)(1) and (2); (2) first-degree kidnapping, N.J. Stat. Ann. § 2C:13-1(b)(1) and(2); and (3) felony murder, N.J. Stat. Ann. § 2C:11-3(a)(3). He stood trial in the New Jersey Superior Court in September 1988.

At trial, Russell used Ferretti's testimony to present diminished capacity and intoxication defenses. Ferretti opined during direct examination that Affinito: (1) was intoxicated the night of the murder; (2) had a personality disorder of the "epileptoid variety" which caused him to have "difficulty with impulse control"; and (3) had suffered permanent brain tissue injury brought about by epilepsy and past alcohol abuse, making him more

susceptible to the effects of intoxicants. Ferretti concluded that such a "vulnerable brain" – coupled with intoxication, the described personality disorder and stress from a fight – would result in a person lacking the capacity to "knowingly and by design perpetrate a murder."

On cross-examination, Ferretti testified that his opinion might change if the facts were materially different from those provided by Affinito. The prosecution then questioned Ferretti regarding Affinito's altercation and strangling of Cupsie in the junkyard. (Ferretti was not even aware of these facts because Affinito omitted mention of them during their interview, and Russell had failed both to mention them to Ferretti and provide him with Affinito's statements to the police.) Ferretti responded that he "would not apply diminished capacity at that point because I would think [Affinito] formulated intent." Ferretti reiterated this position on redirect, though with the qualifying assumption that the additional facts were true.

In its case in rebuttal, the State called Dr. Irwin N. Perr as a psychological expert. After reviewing medical records and interviewing Affinito for approximately three hours, Perr concluded that Affinito was not an epileptic *per se* and did not suffer from any type of brain damage or cognitive disorder.

A jury convicted Affinito on all counts. The purposeful or knowing murder conviction was merged with the felony murder conviction, for which

paid Portnow for his services.

4

Affinito received a sentence of life imprisonment with parole ineligibility lasting thirty years. (He received a consecutive sentence of twenty-five years for the first degree kidnapping conviction.)

In 1989 Affinito appealed his convictions and sentences. In his brief to the Appellate Division of the New Jersey Superior Court, Affinito alleged the trial court committed several errors, including an improper jury charge regarding diminished capacity (erroneously placing on Affinito the burden of proving lack of intent in establishing diminished capacity). In February 1991 the Appellate Division affirmed Affinito's convictions and sentences. Later that year, the Supreme Court of New Jersey denied Affinito's petition for certification.

Nearly three years later Affinito filed in the Superior Court a petition for post-conviction relief under New Jersey's Post-Conviction Relief Act ("PCRA"), N.J. Stat. Ann § 2A:67-16. In the petition he alleged his trial counsel was ineffective by not presenting a viable diminished capacity defense. Specifically, Affinito argued Russell failed to prepare Ferretti properly. At the PCRA hearing, Affinito offered the testimony of a criminal lawyer as an expert. That expert opined that Russell was ineffective because he failed to provide, *inter alia*, Ferretti with a copy of Affinito's statements to the police, did not require Ferretti to consult with Portnow and called Ferretti as an expert instead of the (presumably) more prepared Portnow.

In early 1996 the Superior Court denied Affinito's request for relief, concluding that he failed to sustain his burden of proving ineffective assistance of counsel. Significantly, the Court found Russell's choice of Ferretti was strategic and that Affinito failed to prove whether Portnow was available at the time of the trial and prepared to testify. The Court also found that Affinito failed to demonstrate Portnow's testimony would have differed from Ferretti's had Portnow been called as Affinito's expert.

Affinito appealed once more to the Appellate Division of the Superior Court, which affirmed for the same reasons. Later that year, the New Jersey Supreme Court, as it had done in the direct appeal of Affinito's convictions, denied his request for certification.

Affinito then filed a petition seeking a writ of *habeas corpus* in the United States District Court for the District of New Jersey. He argued that his Sixth Amendment right to effective assistance of counsel was violated for the same reasons he asserted in the New Jersey courts. As noted, the District Court denied Affinito's petition. We granted a certificate of appealability on the issue of whether Russell provided ineffective assistance of counsel.[5]

## II. Standard of Review

We exercise plenary review over

[5] We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

the District Court's decision denying Affinito's *habeas* petition. *Stevens v. Del. Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002). Overlaying our review standard, however, is the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). For matters of fact, a federal court reviewing a *habeas* petition must "presume that the . . . findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." *Id.* (citing 28 U.S.C. § 2254(e)(1)); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000).

As for legal conclusions, *Williams* instructs that a federal court may only grant *habeas* relief if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 402-03 (quoting 28 U.S.C. § 2254(d)(2)); *see also Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000). Under AEDPA, "we must first identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." *Werts*, 228 F.3d at 197 (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999)). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Werts*, 228 F.3d 196. Further, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Werts*, 228 F.3d at 197 (quoting *Matteo*, 171 F.3d at 888).

"If we determine that the state court decision is not 'contrary to' the applicable Supreme Court precedent, then we are required to advance to the second step in the analysis — whether the state court decision was based on an 'unreasonable application of' Supreme Court precedent." *Id.* (citing *Matteo*, 171 F.3d at 888). Here, "a federal *habeas* court [may] grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. In this inquiry, "we are not authorized to grant *habeas corpus* relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." *Werts*, 228 F.3d at 197 (citing *Matteo*, 171 F.3d at 889); *see also Williams* 529 U.S. at 411. Rather, the state court's application of Supreme Court precedent must have been "objectively unreasonable." *Werts*, 228 F.3d at 197 (citations omitted). In other words, a "federal *habeas* court should not grant the petition unless the state court decision, evaluated objectively and on the merits,

resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.*

## III. Affinito's Ineffective Assistance of Counsel Claim

Affinito alleges a violation of his Sixth Amendment right to effective assistance of counsel. Although a number of issues are raised, Affinito essentially argues that Russell provided ineffective assistance because he decided to use Ferretti as the defense expert witness rather than Portnow and failed to provide Ferretti with all relevant discovery documents. We conclude that Russell's performance was deficient. Nonetheless, this does not require a contrary outcome, even in the face of an erroneous jury instruction relating to diminished capacity.

## A. Ineffective Assistance of Counsel Standard

The Sixth Amendment right to effective assistance of counsel is not intended "to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). In *Strickland*, the Supreme Court established a two-prong test to determine when a defense counsel's representation was so inadequate as to warrant reversal of a conviction.

A defendant first must establish his counsel's representation was constitutionally deficient. *Id.* at 687. This

standard is met if counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. Judicial scrutiny in this regard, however, is highly deferential. *Id.* at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* (internal citation omitted). Therefore, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The second *Strickland* prong is reached only when the first exists. If so, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

7

*Id.* at 694. In adopting this standard, the *Strickland* Court determined that a defendant must show more than "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. While a defendant need not show the error "more likely than not altered the outcome in the case," *id.* at 693, it nonetheless must be "sufficient to undermine confidence in the outcome." *Id.* at 694.

## B. Application of the *Strickland* Standard

Affinito argues the District Court erred in concluding that the New Jersey Courts reasonably applied *Strickland*. As stated previously, each individual argument derives from Russell's decision to use Ferretti as an expert witness and failure to provide him with all relevant discovery documents. First, Affinito alleges Ferretti was not qualified to testify in support of a diminished capacity defense and that Portnow's prior evaluation should not have been ignored. Affinito also claims it was unreasonable to have Ferretti testify when he had spent only fifty-five minutes interviewing Affinito, reviewed "no documents," including Affinito's "medical and mental health history," and supported his testimony with the unknown diagnosis of "vulnerable brain." Finally, Affinito contends that Russell's failure to provide Ferretti with Affinito's statements to police fell below any objective standard of reasonableness.

1) <u>Was the Performance of Affinito's Counsel Constitutionally Deficient?</u>

At the outset, we are unpersuaded that Ferretti was inherently unqualified as an expert witness or that hiring him was unreasonable. *Strickland* provides that counsel has wide latitude in making strategic and tactical decisions. 466 U.S. at 669. Determining which psychiatric expert to consult is such a decision, be it strategic or tactical.[6] *See United States v. Kirsh*, 54 F.3d 1062, 1072 (2d Cir. 1995).

In order to circumvent the teachings of *Strickland*, Affinito attempts to paint Ferretti as incompetent by isolating a single statement from his direct testimony. Answering a question on Affinito's mental capacity, Ferretti stated that Affinito "was not acting with mature decision-making capacity and good judgment, [and] therefore had diminished capacity." Affinito claims this demonstrates Ferretti lacked an understanding of the legal definition of diminished capacity — a mental disease or defect that negates the relevant state of

---

[6] Affinito argues that, because Portnow refused to testify until he was paid, the decision to retain Ferretti was a financial, not strategic, one. Regardless whether financial considerations played some part in Russell's decision, his choice remained a strategic one. (Affinito uses "strategic" throughout his briefing, though one could argue that the decision to use Ferretti, as opposed to Portnow, was a tactical means of carrying out the strategy of rebutting the prosecution's case. In this context, we use the words interchangeably.)

mind required for an offense (here intent). *See* N.J. Stat. Ann. § 2C:4-2; *State v. Galloway*, 628 A.2d 735, 743 (N.J. 1993).

But in answering the very next question, Ferretti stated that — in light of Affinito's medical history, his intoxication at the time of the crime and the stress of a fight — Affinito lacked the capacity "to knowingly and by design perpetrate a murder." This demonstrates Ferretti did understand the diminished capacity defense. In fact, Ferretti's uncontroverted testimony establishes him as an expert qualified in the field of psychiatry who has testified in "several hundred" court cases. In this context, retaining him was reasonable.

In addition, Ferretti's examination of Affinito was sufficient based on the record before us. One complaint of Affinito's is that Ferretti interviewed him for only fifty-five minutes. While Ferretti may have interviewed Affinito for a shorter period of time than either Portnow or the State's psychiatric expert, Affinito does not state why, or even if, a fifty-five minute interview is insufficient or contrary to professional standards. And as just stated, Ferretti's uncontroverted testimony establishes him as a psychiatric expert. While a short interview suggests the possibility of a less than thorough evaluation and an unprepared expert witness, Affinito fails to make a persuasive case that, even at this low threshold, his counsel was ineffective.

As for whether Ferretti reviewed any medical or personal documents,

Affinito's claim of no review is incorrect. Ferretti admitted that he had no written background information at the time of his examination. He testified, however, that he reviewed "background material later on, and that involves virtually every aspect of [Affinito's] life, medical history, work history, legal history and family history." This background material, Ferretti opined, supported his independent conclusions.

Further, selecting Ferretti to testify was a reasonable tactical decision because his and Portnow's evaluations, while not identical, are similar. Both noted Affinito had seizures in the past and a personality disorder that lowered his impulse control. Both stated Affinito was an alcoholic and long-time abuser of various drugs. Both based their conclusions on the fact that, on the night of the murder, Affinito was suffering from a convulsive disorder, was highly intoxicated and was attempting to thwart a perceived homosexual advance from Cupsie. In addition, Ferretti's use of the phrase "vulnerable brain" is not that dissimilar from Portnow's report describing Affinito as a "congenitally damaged individual" and a "central nervous system damaged individual." One could take issue with Ferretti's choice of words, but this does not demonstrate that Russell's reliance on Ferretti's expert opinion was unreasonable.

We conclude, however, that Russell's failure to provide Ferretti with Affinito's statements to the police fell below any constitutionally required standard of reasonable representation. Affinito's statement to the police differed

in several respects from the version of the incident told to Ferretti. Specifically, Affinito failed to mention the second strangling at the junkyard. On cross-examination, Ferretti was asked a series of hypothetical questions to determine if his diagnosis of diminished capacity would change, including the following:

> [I]f Affinito further threw [the victim] in the trunk, drove him several blocks away from that location in a deserted area, opened the trunk and [the victim] was still alive and tried to get out of the trunk and Affinito beat him and strangled him and killed him at that spot, how about those factors?

Unbeknownst to Ferretti, this hypothetical mirrored the actual facts of the case. Ferretti replied that, under those facts, he "would not apply diminished capacity at that point because I would think he formulated intent."

When the key issue in a criminal case is whether the defendant suffered from diminished capacity, we can think of nothing more critical than ensuring that the defense's psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible. The decision not to avail Ferretti of Affinito's statements defies logic. A defendant's own statements to the police have to be some of the most, if at times not the most, crucial documents with which an evaluating mental health expert should be familiar. It is almost inconceivable that Ferretti could take the witness stand without knowing Affinito engaged in a second struggle with Cupsie at the junkyard and strangled him again. This was not a trial tactic, it was gross incompetence. Even assuming the decision not to provide Ferretti these statements was deliberate, it satisfies the first prong of *Strickland*. *See United States v. Tucker*, 716 F.2d 576, 586 (8th Cir. 1983) (stating that some "defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally deficient").[7] Any intimation to the contrary by the New Jersey Courts is an unreasonable application of *Strickland*.

2) Did Affinito Suffer Prejudice Because of His Counsel's Error?

Having concluded that Russell's failure to provide Affinito's statements to Ferretti was constitutionally deficient, we examine whether this error satisfies the second, or prejudice, prong of *Strickland*. To constitute prejudice, Russell's error must undermine our confidence in the outcome of the case. *Strickland*, 466 U.S. at 694. Admittedly, this error (leading to Ferretti's reversal of opinion on cross-examination) *de facto* prevented Affinito

---

[7] All of this, of course, begs the question of why Russell did not simply tell Ferretti all the pertinent facts surrounding Cupsie's murder. This alone underscores Russell's lack of adequate assistance to Affinito.

10

from presenting any diminished capacity defense.

In the New Jersey Courts and before us, Affinito points to Portnow's evaluation, made with full knowledge of the facts of the case, as strong evidence supporting his diminished capacity defense and undermining his conviction. In response, the Appellate Division of the Superior Court concluded on PCRA appeal that, had Portnow been called to testify, "his conclusion would have been subject to a similarly damaging cross-examination as was" Ferretti's. Therefore, Affinito had not demonstrated "a reasonable likelihood that a different result would have been reached." Under AEDPA, it is not for us to determine whether we agree with, or would rule identically to, the New Jersey Courts. Our only inquiry is whether their application of *Strickland* was objectively unreasonable. It was not, even assuming that Portnow would have testified with full knowledge of the facts and would not have abandoned the diminished capacity defense as Ferretti did.[8]

---

[8] We reject as unreasonable the Appellate Division of the Superior Court's conclusion on direct appeal that "it must be assumed that Dr. Portnow's opinion is not based upon a complete recitation of the facts." Portnow's written report states that Affinito's and Perez's statements to the police were a source of information. While it is certainly ironic that Portnow's report omitted mention of the effect of those statements (and, as noted below, cross-examination on this point would

Portnow's written report contained many omissions and inconsistencies when compared to Perez's eyewitness testimony. In Portnow's report, Affinito is quoted as stating that Perez took out a pipe, put white powder into it, and smoked it. But Perez testified Affinito had pulled out a pipe and pretended to fill it with marijuana. Affinito is also quoted as saying that Cupsie started "to climb out of his seat to get in the back with me." Once again, Perez testified that Affinito was unprovoked and grabbed Cupsie unaware from behind. Portnow's report also fails to address *any* of the specific facts that provide the context for Cupsie's death — such as Affinito's expressed desire to take the car, his talk of being able to render Cupsie unconscious with a sleeper hold, lulling Cupsie into a vulnerable position with the ruse of smoking marijuna, the statement (when Cupsie was already bloody and unconscious) that Cupsie had to be killed, the decision to dispose of the body in a junkyard, and the second strangling upon discovering that Cupsie was not, in fact, dead.

Unlike our dissenting colleague, we believe these omissions and inconsistencies terminally undermine Affinito's defense. First, the

---

have significantly discredited Portnow's testimony), it is unreasonable nonetheless to assume Portnow had no knowledge of the information contained in these statements, or that he would have abandoned his diminished capacity diagnosis as Ferretti did.

inconsistencies noted in the preceding paragraph involve physical actions (who did what), not Affinito's alleged auditory hallucinations (who said what). (Per Portnow's report, Affinitio "denies visual hallucinations and paranoid ideation.") Further, Portnow premised his opinion on Cupsie initiating the altercation, writing in the "Conclusions" section of his report that "Cupsie made a physical advance towards Affinito which sparked off a seizure like rage in Affinito." But as just discussed, Perez testified that Cupsie made no physical advances in the car and was the victim of an unprovoked attack. Because Affinito admittedly was not suffering from visual hallucinations, the lynchpin of Portnow's entire analysis is suspect. In addition, Perez's testimony is internally consistent, painting the story of a joyriding plan gone horribly wrong. Portnow's report makes little attempt to put the events of the evening in context.

Affinito had the opportunity to call Portnow, or another psychological expert, to testify at the PCRA hearing, but failed to do so (for whatever reason). In this context, we will not speculate on the outcome of theoretical testimony, especially when many of Affinito's arguments on appeal are based on the supposed thoroughness and quality of Portnow's evaluation and report.[9] Given

the overwhelmingly one-sided nature of the evidence in this case and the failure of Portnow's report to address this evidence adequately, Affinito has failed to meet his demanding burden to demonstrate that the PCRA Court unreasonably applied *Strickland*.

**C. Erroneous Jury Instruction**

On direct appeal, the prosecution conceded that Affinito was erroneously required to prove diminished capacity by a preponderance of the evidence, violating his due process right to have the prosecution prove intent beyond a reasonable doubt. *See Humanik v. Beyer*, 871 F.2d 432, 443 (3d Cir. 1989).[10] The Superior Court found harmless error, largely based on Ferretti's admission on cross-examination that the actual facts of the case were inconsistent with diminished capacity. But this only covers one constitutional error (the incorrect

appropriate records . . . , it would have had a significant [e]ffect on the jury." Yet the preceding discussion demonstrates that Portnow's report leaves much to be desired. As Affinito had the opportunity to put the opinion of a second expert in play, we decline to offer him a third bite at the apple. We are not, however, unsympathetic to Affinito's position. Were other psychological evidence favorable to Affinito in the record, our conclusion might have been different.

[9] For example, Affinito argues in his brief that "had counsel . . . called an expert witness, like Dr. Portnow, who was capable and qualified to support the defense and who had been provided with

[10] As noted by the Superior Court, Affinito did not object to the jury instruction at trial.

12

instruction) with another (the failure to provide Ferretti with all the facts of the case). Indeed, our dissenting colleague argues that "[h]ad a properly prepared expert testified, Affinito would have obtained a new trial based on the erroneous diminished capacity instructions that infected his first trial."

This interrelating (some might say compounding) of errors, however, is ultimately harmless.[11] "*Humanik* does not compel or even permit us to grant [a writ of *habeas corpus*] without considering whether the error was harmful. A contrary holding would violate well-settled Supreme Court precedent that 'a constitutional error does not automatically require reversal of a conviction.'" *Kontakis v. Beyer*, 19 F.3d 110, 115 (3d Cir. 1994) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)). An error is harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

(1946)).[12] Overwhelming evidence that a defendant acted with intent may also render an erroneous jury instruction harmless. *See id.* at 118.

Based on the strong evidence in the record, and with scant evidence putting a contrary outcome in play, we conclude that the trial court's erroneous instruction did not have a substantial and injurious effect on the jury's verdict (even absent Ferretti giving up Affinito's diminished capacity defense). As detailed in the previous section, the written report of Dr. Portnow contained many, and major, inconsistencies and omissions when compared to Perez's uncontroverted eyewitness testimony.

Further, the testimony of Dr. Perr, the State's psychological expert, was comprehensive.[13] Based upon extensive

---

[11] Despite AEDPA, we conduct an independent harmless error analysis because the Superior Court's analysis was based on an improper consideration — *i.e.*, Ferretti's cross-examination testimony. *See Cone v. Bell*, No. 99-5279, 2004 U.S. App. LEXIS 3882 at *33-34, 359 F.3d 785 (6th Cir. Mar. 1, 2004) (concluding the AEDPA standard of review did not apply when no state court had considered the particular issue to be decided).

[12] As we recognized in *Kontakis*, the Supreme Court has ruled that in a *habeas* case, as opposed to a direct appeal, federal courts should apply the *Kotteakos* "substantial and injurious effect" test as opposed to the *Chapman v. California*, 386 U.S. 18 (1967), "beyond a reasonable doubt" test used by the Superior Court. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

[13] While the record does not contain Dr. Perr's written evaluation, his trial testimony covers seventy-five pages in the record. Contrary to our dissenting colleague's assertion, we believe this testimony covers broadly, and at times in depth, Affinito's medical health history.

testing and evaluation, Dr. Perr concluded that Affinito was of normal intelligence, had issues with impulse control, and had an anti-social personality. Perr concluded, however, that Affinito did not suffer from brain damage of any kind or from any disorder that prevented him from forming the requisite intent to commit knowing or purposeful murder. In addition, Perr noted that Affinito was not an epileptic *per se,* had suffered only one possible seizure in the seven years prior to the murder, and was not more susceptible to the influence of drugs and/or alcohol as a result of his past seizures. Finally, this conclusion was not in any way based upon the second strangling.[14]

In this context, the evidence of Affinito's diminished capacity is so underwhelming and remote that, even with Ferretti's concession aside and a correct jury instruction in place, we perceive no reasonable likelihood of it prevailing. Thus we disagree with the dissent's conclusions that Affinito had a "seemingly ironclad" winning argument on direct appeal and that there is a reasonable probability Affinito would have been convicted of a lesser included offense at a new trial.

## IV. Conclusion

Despite the two constitutional errors before us, we nonetheless conclude that the evidence of diminished capacity was so threadbare, and the evidence of knowing and purposeful intent to murder so strong, that the jury's guilty verdict was not undermined. The errors — slipshod as they were and normally requiring a new trial — in the circumstances of this unique case were harmless. Accordingly, we affirm the District Court's denial of Affinito's petition for a writ of *habeas corpus.*

RENDELL, Circuit Judge - dissenting.

As the majority notes, I disagree with its analysis of prejudice. In my view, but for the ineffectiveness of counsel, there is a reasonable probability that the outcome of Affinito's trial would have been different – namely, that Affinito would have been convicted of manslaughter, rather than murder.[15] At the

---

[14] The following exchange occurred on redirect examination: "Q. So, for your purposes you didn't care if John Cupsie died at Liberty Street or at the junkyard? A. That's correct, that's irrelevant to my evaluation of the person, that is correct."

[15] I note that diminished capacity would only be a defense to those crimes where his mental disease or defect effectively negated the required mental state. N.J. Stat. Ann. § 2C:4-2 (2003). Here, it would appear to be a defense to crimes requiring intent or knowledge, such as murder and kidnapping, see id. §§ 2C:11-3, :13-1, but it would not shield Affinito from a conviction for some form of manslaughter where the requisite mens rea is recklessness, see id. § 2C:11-4.

very least, our confidence in the outcome is undermined by the combined errors that plagued his trial – an expert who abandoned Affinito, sealing his fate, and an erroneous jury instruction. As such, these errors were prejudicial, the state appellate court's determination in connection with the prejudice prong was unreasonable, and habeas relief should have been granted.

When we assess "reasonable probability," we are of necessity hypothesizing, or speculating to a certain extent, about another likely outcome. We must imagine what alternative scenario might have played out if the claimed error had not occurred. In a situation such as this, the requisite mental state of intent and its relationship to any mental disease or defect of the defendant is admittedly an issue requiring expert testimony. The question of intent was critical here, and I cannot help but believe that the outcome would have been different if Affinito's mental condition and history had been explained by an expert who had been properly prepared, to a jury that had been properly instructed.

The majority's contention that there was compelling evidence from which intent could be determined is faulty. Certainly, there were Affinito's actions – gruesome, cruel actions, which were described to the jury by Perez. But do these actions alone necessarily speak to Affinito's state of mind at the time the crime took place? The difficulty here is that without an expert to explain otherwise, they do. And that is precisely

why the woeful preparation of Ferretti, leading to his abandonment of Affinito's major theory of defense, was so very damaging.

Several aspects of the way in which the trial played out as a result of counsel's ineffectiveness compel the conclusion I reach. First, an expert psychiatrist in possession of all relevant documents had previously rendered an opinion stating that Affinito experienced auditory hallucinations, suffered from a major psychotic disorder, and was congenitally damaged. This raises the distinct probability that a similar opinion was obtainable (with proper preparation) and should have been offered. Moreover, Portnow's opinion referred to previous hospitalizations and diagnoses of "major affective disorder" and "borderline psychotic disorder." This was quite unlike the opinion of Dr. Perr, which the majority found to be comprehensive, as Perr referenced no such mental health history or previous diagnoses. In addition, counsel's cross examination of Perr was totally inept, concentrating only on sustained drug and alcohol use as the possible root of Affinito's problems. Absent the aid of a defense expert who could provide an opinion supporting the idea that Affinito suffered from diminished capacity, counsel was left with no other basis for attacking Perr's conclusions or challenging his testimony.

The majority questions whether Portnow would have been effective on cross examination because the version of events outlined in the body of his report,

15

where he describes the story as related to him by Affinito, differed from the version relayed by Perez in his testimony. But to me, any such variations between the two accounts – and especially Affinito's recounting of hearing voices, with the "sexy" voices getting louder and louder, as described in Portnow's report – would not cast doubt on the basis for Portnow's opinion; rather, they would bolster the fact that, although he may not have been experiencing visual hallucinations, Affinito perceived the events differently from Perez. And, that was precisely the point of Affinito's diminished capacity defense.

Moreover, we should not assume, based on the fact that Portnow primarily recounts the incident as Affinito described it, that Portnow did not also take Perez's version of the events into account. We do know from his report that Portnow – unlike Ferretti – did review Perez's statement to the police. If he did, then the inconsistencies in Affinito's tale would not be problematic as far as Portnow's opinion is concerned. Since he was already aware of the contents of Perez's statement, Portnow would presumably state on cross examination that, while he referenced Affinito's account in the body of his report, he considered the facts relayed by Perez as well when he formed his opinion. Unless Perez's trial testimony differed dramatically from the story he told police initially, it is not a stretch to assume that Portnow would have been prepared to explain or reconcile any of the perceived inconsistencies referenced by the majority when asked about them at trial.

Further, the Superior Court completely discounted the effect of counsel's obtaining another expert, such as Portnow, to testify. It incorrectly, and unreasonably, assumed that Portnow based his opinion on something other than a complete factual record. Such a determination is clearly unfounded, since Portnow's report explicitly indicates that he considered all of the pertinent material.[16] Having reached that incorrect conclusion, the state court unreasonably stopped short of considering how an explanation of the relevant history and diagnoses by a qualified expert would have impacted the trial. Such testimony, which I would by no means characterize as evidence that is underwhelming or remote, would have provided a basis for the jury to find that Affinito's actions were the product of his compromised mental functioning.

The prejudice caused by the ineffectiveness of Affinito's counsel was compounded by the trial court's instructions to the jury, which incorrectly placed the burden of proof regarding mental state on Affinito. The trial court

---

[16]The majority concedes as much, yet curiously still defends as reasonable the state court's assumption that Portnow would have been susceptible to the same damaging cross examination as Ferretti based on his failure to explicitly reference certain facts in the body of his report.

expounded at length – for nearly seven pages of the trial transcript – on the law of diminished capacity, repeatedly stating that it was the defendant's burden to prove that his mental disease or defect had prevented him from forming the intent required by the murder and kidnaping statutes. In other words, the trial court instructed the jury that the defendant had to disprove the mental state elements of the crimes charged. This instruction was admittedly erroneous in light of our decision in Humanik, because it improperly relieved the prosecution of the burden of proving an element of the crime, as the Superior Court recognized. Additionally, with Ferretti's collapse and no expert testimony supporting a diminished capacity defense, the defense had offered no proof whatsoever with regard to mental state.

Here, again, the Superior Court failed to comprehend the significance of the combined effect of these two errors. On direct appeal, the court determined that the jury instruction error was harmless. The court based this conclusion on its observation that Ferretti's testimony, offered by the defense, had proven that Affinito had formed intent, presumably meeting the Commonwealth's burden. Then, during the state post-conviction proceedings, the Superior Court unreasonably determined that any ineffectiveness on the part of Affinito's trial counsel had not caused Affinito prejudice, without considering how the proceedings on direct appeal were impacted by counsel's incompetence. The court failed to realize that the prolonged erroneous instructions by the trial court doomed Affinito, when he had presented no expert opinion to fulfill his purported "burden" of proving mental state. Thus, Ferretti's testimony not only robbed Affinito of a defense, it also robbed him of a seemingly ironclad argument on direct appeal based on the improper allocation of the burden of proof on this very issue!

Had a properly prepared expert testified, Affinito would have obtained a new trial based on the erroneous diminished capacity instructions that infected his first trial. And, had a proper jury instruction been given at his new trial, requiring the Commonwealth to prove that Affinito's crime was not the result of a mental disease or defect, there is a reasonable probability that, given Portnow's diagnosis of his mental disorder, the jury would have convicted Affinito of a lesser included offense. Thus, the error here was not clearly harmless, as the majority concludes. Since the state court's analysis and determination regarding the ineffectiveness of Affinito's counsel was an unreasonable application of Strickland, I submit that the writ should issue affording Affinito a new trial.

17